JANSSEN, Respondent, v. TUSHA, et al, Appellants
(Two cases)

(287 N. W. 501.)

(Files Nos. 8192 and 8193.   Opinion filed August 16, 1939.)

*H. L. Bleeker* and *Danforth & Seacat,* all of Alexandria, and *Danforth & Danforth,* of Sioux Falls, for Appellants.

*H. VanRuschen,* of Salem, for Respondents.

*C. H. McCay,* of Salem, for Impleaded Defendants.

SMITH, J. Separate actions were brought by two brothers against the administratrix of their mother's estate and others, for the purpose of quieting title to separate parcels of real property. These parcels of real property came to the respective brothers through contemporaneous transactions carried on with their mother wherein the real property was conveyed to the brothers in consideration of their separate promises to make certain payments to their mother. The instruments signed by the sons were identical in every respect except as to the description of real property and the amounts of certain payments to be made. The subject of controversy in the litigation has to do with the interpretation of the agreements so made between the mother and sons. On the one hand it is maintained that the agreements were correctly interpreted by the learned trial court as providing for a principal indebtedness on the part of the sons of $7200 and $7000, respectively, payable respectively $500 per year during the life of the mother and the full balance upon her death. On the other hand the appellant

daughters contend that the agreement should be interpreted as providing for the payment of $500 per year respectively by the sons during the life of the mother, and the full respective sums of $7200 and $7000 on demand after her death. The actions were tried together, and are by stipulation submitted and considered together upon appeal.

As instruments identical in terms, except as to the description of land and the amounts involved, were delivered between the mother and each of her three sons, and the matters at issue in the actions at bar are identical, we develop the facts in connection with the instruments in the transaction with one of the sons.

The facts necessary to an understanding of the issues may be stated as follows: Pursuant to prearrangement the mother, her three sons, and three individuals including the mother's minister and banker, met at the office of the banker on the 24th day of June, 1918, for the avowed purpose of arranging a division of the mother's estate among her eight daughters and three sons. She owned four quarters of land, a home in town and its furnishings, and had about $4000 on deposit in the bank. At that time she executed and delivered a deed to a particular quarter of land to each of her three sons. The revenue stamps affixed to the deeds here involved indicate that they were each valued at $16,000. Each son executed a mortgage on his quarter for part of its value, and each deed recited a consideration of the amount of the mortgage executed by that son "and other considerations."

The following are copies of all, or of the essential parts, of the instruments executed by one of the sons:

"Agreement
"June 24, 1918

"For and in consideration of one dollar and other valuable considerations, we: Dick Janssen a widower, herewith bind myself, heirs, assigns and administrators, by and to these presents That I will pay unto Anna Janssen, a widow, (my mother) of Emery, Hanson County, South Dakota, during the remainder of her natural life the sum of Five Hundred Dollars ($500.00) for each and every year during the balance of her life, same payable at the Farmers Bank of Emery, South Dakota, on or before the 1st day of January of each year, starting with January 1st, 1919.

"This agreement being as a part payment for the deed made to me by said Anna Janssen, dated June 24, 1918, conveying the Northwest Quarter of Section four (4) in Township One Hundred and one (101) north, of range fifty-six (56) west of the 5th P. M.

"In witness whereof I herewith bind myself, heirs, agents, assigns and administrators by and to these present and constitute this a claim upon the above described land for and during the term of the natural life of the said Anna Janssen (my mother)."

Promissory Note

"Stamps $1.40                                         Note
"$7200.00                                    Emery, South Dakota
                                                    June 24, 1918

"On demand without grace, for value received, I promise to pay to the order of the administrator of the estate of Anna Janssen Seventy-two Hundred and no/100 Dollars.

"At the Farmers Bank, Emery, South Dakota. With interest at the rate of Six percent from the date of demand in writing.

"The makers and endorsers severally waive presentment for payment, protest and notice of protest for non payment of this note. "NW Qr. Sec. 4 Twp. 101 R. 56."

The mortgage accompanying the above note described the administrator of the estate of Anna Janssen as the mortgagee and the indebtedness incurred as follows: "* * * as security for the payment to said mortgagee at the Farmers Bank of Emery, South Dakota, of the principal sum of Seventy-Two Hundred and no/100 Dollars and interest thereon at six percent per annum from death of Anna Janssen, according to One Certain promissory note bearing even date herewith due after proving of Will and Starting of probate proceedings of the estate of Anna Janssen in any Court within the state of South Dakota. * * *"

The three sons joined in executing and delivering to the mother an agreement reading as follows:

"State of South Dakota ⎰
                       ⎱ SS
"County of Hanson ⎱

"John D. Janssen and Anna Janssen, husband and wife; Dick D. Janssen, (a widower), Sander D. Janssen and Jennie Janssen, husband and wife; after being first duly sworn say upon oath, that in consideration of having at this time received deeds to certain

lands in McCook County, South Dakota, as described in certain deeds to them by Anna Janssen, of Emery, Hanson County, S. D., dated June 24th, 1918, for and 'at a price less than market value' for the reason that the said Anna Janssen wishes to dispose of her estate as to the part therein to us, now therefore, we each and every one of us, severally hereby waive any further right, to any. interest in the estate of Anna Janssen, and herewith bind ourselves, heirs, assigns or administrators not to make or cause to be made or instituted any proceedings in any court now or at any time hereafter for a further share of said estate, we herewith agreeing that the division as made by our mother, Anna Janssen, is correct and satisfactory to us. However in case the Anna Janssen feels at any time that she has accumulated more property in the future than will constitute a fair share to her other children she will voluntarily surrender this waiver and destroy a will by her made at this time and make a new will which will dispose of her property at her death in a fair and equitable way.

"Further, that while we have received at her hands at this time our fair and equitable share of her estate, we bind ourselves, heirs, agents, assigns, and administrators to do everything in our power to make her declining years a pleasure to herself and to all her children.

"In Witness whereof, we have hereunto set our hands and seals this 24th day of June, A. D. 1918."

As we have indicated above, a separate quarter was conveyed to each of the other two sons, and they, in turn, executed and delivered similar agreements to their mother. The mother at the same time made a will disposing of the remainder of her estate to her daughters. This will, by its express terms, excluded the sons from any participation in her estate.

During the course of the negotiations, the estate of the mother was appraised by the parties to represent an aggregate value of $69,940, to which aggregate amount two of the sons had contributed $2500 by way of improvements to real property. This unsigned memorandum indicates a plan whereby the sons should each share in their mother's estate in the respective amounts of $7500 each, and the daughters in the respective amounts of $5617.50 each. According to this memorandum, that portion of the estate of the mother in which the daughters were to share included the above

described mortgages of the sons in the sums of $7000, $7200, and $8500 respectively.

The mother lived for approximately fourteen years after the date of the transactions described. In the interim the two sons here involved had made their annual respective payments of $500 each, and claimed in this litigation that their obligations to their mother only required them to pay the principal amount described in their mortgages at the rate of $500 per year during her life and the balance at the time of her death, and that payments they had made during her life had discharged that obligation.

The record discloses that the court received numerous written and oral admissions by the sons adverse to their contentions, and that it reserved ruling upon parol evidence favorable to the contention of the sons. As we have indicated, the learned trial court interpreted the agreements in accordance with the contentions of the sons, and entered its decree quieting title in them.

Before we may address ourselves to the major issue dealing with interpretation, an analysis must be made of the materials legally available to the court as the subject matter of the process of interpretation. The parol evidence rule upon which the daughters predicated their contention that certain materials must be excluded from consideration, is substantive in character and operates to limit the evidence from which interpretative inferences may be drawn. Wigmore on Evidence, 2d Ed., § 2400; Williston on Contracts, Rev. Ed., § 631.

It is elementary that the parol evidence rule only has application to such transactions as are here involved when the parties have adopted a writing or writings as the definitive expression or integration of their agreement. That the mother and sons attempted to reduce their whole agreements to writing, and that the very subject matter of this controversy, namely the amount the sons were obligating themselves to pay, was comprehended and fixed by written memorials, is not open to question under this record. So the parol evidence rule applies.

Three sorts of parol evidence were offered by the sons, namely, (1) General content of the negotiations leading up to the consummation of the written agreements of the parties; (2) declarations of intention made by the mother before, contemporaneous with, and

after the adoption of the writings; and (3) the surrounding circumstances.

■ The sons do not contend that the writings contain ambiguities which disappear when exposed to the light of parol evidence. Attempt is made to justify resort to extrinsic evidence under the exception to the parol evidence rule dealing with consideration. The position is not maintainable. The contractual obligation of the sons to pay in the future was the consideration received by the mother for her conveyances. Therefore the contention is ruled by Farmers' Elevator Company of Colton v. Swier et al., 50 S. D. 436, 210 N. W. 671, 673. It was there said: "We believe that the rule supported by the great weight of authority, and which should be well understood and uniformly adhered to, is that where a contract which has been reduced to writing and executed by the parties is complete, clear, and unambiguous in its terms and contains mutual contractual covenants, or where the consideration consists of a specific and direct promise to do or not to do certain things, this part of the contract, in the absence of fraud, mistake, or accident, cannot be changed or modified by parol or extrinsic evidence, nor can new terms be added to the contract, nor to the contractual consideration therein expressed, nor, where all these facts exist, may a party to a contract show that he was induced to sign the contract by the making of a prior or contemporaneous oral agreement, where such showing would be tantamount to adding to or subtracting from the contractual consideration expressed in the written contract." Also see note 100 A. L. R. page 17.

■ The parties having adopted written instruments as a complete integration of their agreements, and there being no contention that the writings so adopted are ambiguous, preceding or accompanying oral negotiations or stipulations are excluded from consideration as aids to interpretation. 860, Rev. C. 1919, SDC 10.0604.

The most conclusive answer we have found to all of the remaining contentions the sons make with reference to the parol evidence adduced appears in the logical and instructive opinion of Judge Learned Hand in the case of Eustis Mining Company v. Beer, Sondheimer & Company, Inc., D. C., 239 F. 976, 984, which deals with the identical sorts of evidence. In the course of his opinion Judge Hand said:

"It makes not the least difference whether a promisor actually

intends that meaning which the law will impose upon his words. The whole House of Bishops might satisfy us that he had intended something else, and it would make not a particle of difference in his obligation. That obligation the law attaches to his act of using certain words, provided, of course, the actor be under no disability. * * * Hence it follows that no declaration of the promisor as to his meaning when he used the words is of the slightest relevancy, however formally competent it may be as an admission. Indeed, if both parties severally declared that their meaning had been other than the natural meaning, and each declaration was similar, it would be irrelevant, saving some mutual agreement between them to that effect. When the court came to assign the meaning to their words, it would disregard such declarations, because they related only to their state of mind when the contract was made, and that has nothing to do with their obligations. This is, of course, a wholly different question from a preceding or subsequent agreement assigning an agreed meaning to any given words used in another contract. * * *

"The admissibility of the general surroundings in which the contract was written * * * rests upon quite a different basis, one which can be said with a nearer approach to accuracy to turn upon the ambiguity of the written words. All the attendant facts constituting the setting of a contract are admissible, as long as they are helpful; the extent of their assistance depends upon the different meanings which the language itself will let in. Hence we may say, truly perhaps, that, if the language is not ambiguous, no evidence is admissible, meaning no more than that it could not control the sense, if we did let it in; indeed, it might 'contradict 'the contract—that is, the actual words should be remembered to have a higher probative value, when explicit, than can safely be drawn by inference from surroundings. Yet, as all language will bear some different meanings, some evidence is always admissible; the line of exclusion depends on how far the words will stretch, and how alien is the intent they are asked to include."

■■ With these principles in mind we turn to the written instruments. As connected contemporaneous writings dealing with a single transaction, for purposes of interpretation, they must be read together as one contract. § 872, Rev. Code 1919; Rasmussen et al.

v. Hodges et al., 52 S. D. 100, 216 N. W. 862; Taylor v. Nissen et ux., 58 S. D. 299, 235 N. W. 703; Williston on Contracts, supra, § 628. From such a reading of these writings we have formed two conclusions which seem so inescapable that we do no more than to state them. First, to convey the meaning for which the sons contend it would be necessary to rewrite the instruments and modify some of their terms and add others. Second, in their present form the meaning of the writings is clear and unambiguous. By unequivocal terms the sons assumed two distinct obligations. They each agreed to pay $500 "for each and every year during the balance" of their mother's life. This obligation was unlimited in amount, and was to constitute a claim on the land described. They also agreed to pay a fixed sum, by the promissory notes and mortgages, which sum was payable on demand "after proving of will and starting of probate proceedings of the estate of Anna Janssen." This obligation was to be secured by a mortgage upon the same land. From these conclusions and the principles we have reviewed supra, it follows that extrinsic evidence may not be considered in determining the terms of the agreements of these two sons and their mother, and that the lower court erred in not adopting the interpretation for which the daughters contended.

The briefs suggest that it is unreasonable to assume that the mother and sons intended the only meaning their written agreements convey to us. We can not admit the premise. The nub of this whole controversy appears in the fact that real estate considered in 1918 to be very valuable has suffered an unprecedented and unpredictable depreciation in value. Unfortunately, this harsh and stubborn fact does not constitute a ground for relief at the hands of the court. However, what which the courts are powerless to do may be speedily accomplished by these sons and daughters if approached in a spirit of affection for each other.

The sons make a further point which must be briefly considered. They have maintained throughout that the notes and mortgages were ineffective and void because not made to a person in being. The notes being payable to a nonexisting person, and such fact being known to the makers, constituted valid bearer paper in the hands of the mother to whom they were intentionally delivered. § 1713, Rev. Code 1919, SDC 46.0114. The position taken with reference to the mortgages we regard as sound. We

have found no authority, and are aware of no principle of law, supporting the legality of a mortgage naming a nonexisting mortgagee. However, the sons and the beneficiaries of their agreements with the mother are before a court of equity, the intention of the mother and sons is clear and is evidenced by the written instruments the sons delivered to their mother, the sons retain the consideration for their promise, the pleadings are sufficient, and the powers of the court are ample. A court of equity may disregard the defect and enforce the instruments as equitable mortgages. 41 C. J. 303, § 51.

The judgment of the trial court is reversed.

WARREN, P. J., not sitting.

POLLEY, ROBERTS, and RUDOLPH, JJ., concur.