NATIONAL BOULEVARD BANK OF CHICAGO, a National Banking Association, Plaintiff and Appellee,

v.

John J. MAKENS, M.B.I., Inc., a South Dakota Corporation, Makens Bros., a South Dakota Corporation, Shirley Makens, Administratrix of the Estate of Raymond Joseph Makens, deceased, Michael Robert Makens, Richard Makens, Clark County Cattle Company, Sharon Fanning, John F. Makens, personally and as Trustee of the John J. Makens-Elizabeth R. Makens Irrevocable Trust Agreement dated January 25, 1974, Frank Brandl, and Elizabeth R. Makens, Defendants and Appellees,

and

Clark County Cattle Company, Garnishee and Defendant and Appellee.

CLARK COUNTY CATTLE COMPANY, Plaintiff and Appellant,

v.

M.B.I., INC., Michael Robert Makens, Richard Makens, and Shirley Makens, Administratrix of the Estate of Raymond Joseph Makens, Deceased, Defendants and Appellees,

and

John J. Makens, Cross-Defendant and Appellee.

Nos. 14263, 14272 and 14274.

Supreme Court of South Dakota.

Argued Jan. 18, 1984.

Decided June 19, 1985.

Rehearing Denied July 29, 1985.

James C. Roby of Oviatt, Green, Schulz & Roby, Watertown, for plaintiff and appellant; Ross H. Oviatt of Oviatt, Green, Schulz & Roby, Watertown, on brief.

Richard H. Battey of Gallagher & Battey Redfield, for defendants and appellees M.B.I., Inc., Makens Bros., Michael Robert Makens, and Richard Makens.

John C. Quaintance of Quaintance, Swanson & Johnson, Sioux Falls, on brief, for defendant and appellee Shirley Makens, Administratrix of the Estate of Raymond Joseph Makens, Deceased.

Alan L. Austin and J. Douglas Austin of Austin, Hinderaker & Hackett, Watertown, on brief, for plaintiff and appellee National Boulevard Bank.

WOLLMAN, Justice.

### FACTS AND PROCEDURAL HISTORY

This is an appeal by Clark County Cattle Company, one of the plaintiffs in this consolidated action. The other plaintiff, National Boulevard Bank of Chicago (Bank), obtained judgment against John J. Makens for $107,446.77. Bank is not appealing the judgment in its action; however, it served a notice of review (# 14272) supporting the appeal of Clark County Cattle Company. Defendants and appellees have also filed a notice of review (# 14724). We affirm.

John J. Makens and James Makens, Jr. were brothers who had an extensive history of speculation in various fields of economic enterprise. Their business activities included the fabrication of structural steel, the operation of a potato processing plant, and a corporation entitled Computer Micro Services, Inc. (CMS), of which more later. Their partnership in a farming operation in Clark County is the focal point of this appeal.

Prior to September 1967, the history of the Makens brothers' farming activities was not unlike any other farming partnership involving the acquisition and building of such an operation by two brothers. Each partner contributed in his own way to the real estate holdings, which culminated in the acquisition of 5,850 acres of Clark County farmland, together with machinery and livestock.

When each of their several businesses began to fail, John and James endeavored to use the assets of one enterprise to save another. On September 8, 1967, they executed a mortgage in the amount of $132,-000.00 covering a tract of Makens property consisting of 2,672.85 acres. Subsequently, mortgages of $125,000.00 and $130,000.00 were executed on units of partnership property, and on May 18, 1970, all of the partnership real estate was mortgaged for $250,000.00. On April 22, 1972, an additional mortgage in the amount of $250,-000.00 was executed covering the real estate.

During this period, individual guarantees in the amount of $750,000.00 each were also given by John and James to the First National Bank of St. Paul to secure venture capital for several of the Makens enterprises. Against this backdrop of encumbrances and venture financing, John and James formed various corporations for the purpose of obtaining the required capital.

On June 18, 1969, John and James acquired ownership of stock in plaintiff Clark County Cattle Company (Cattle Company), the total outstanding stock which consisted of 30 shares. After the June 18, 1969, transaction, 15 shares were owned by one Harlan Palmquist and John and James owned 7½ shares each. This company had been incorporated by others for the purpose of conducting a livestock feeding operation.

On January 9, 1973, Makens Bros., Inc. was formed, the original incorporators of which were John J. Makens 100 shares, James Makens, Jr. 100 shares, and Raymond Makens, a son of James Makens, Jr., 1 share. Although the partnership real estate was transferred to Makens Bros., Inc., the corporate stock of this company was never issued, and the land continued to be operated by John and James.

James Makens, Jr. died on January 16, 1973, an occurrence that coincided with the

time of greatest financial difficulty for the Makens brothers' partnership. Following James' death, his sons, Raymond, Richard, and Michael (the nephews), together with John, attempted to salvage the assets which John and James had accumulated. Over the course of the next eight years, various documents were executed with diverse purposes in mind. These documents included, but were not restricted to, quit claim deeds, leases, memorandum agreements, extension agreements, invoice documents, partnership agreements, agreements to purchase, trust agreements, balance sheets, and letters. The evidence presented during the course of the litigation made it abundantly clear that a great number of these documents were executed for limited purposes, which were different from the purposes that appeared to be clear on the face of the instruments. Indeed, the trial court found that it was the parties' prevalent practice to enter into agreements and execute documents and then to totally ignore their mandates and treat them as if they had no validity.

John and James Makens were apparently compatible business partners and had complete trust in each other, for there had been a long history of joint ventures between them. They expected that each party would be fair with the other, and, therefore, express agreements were seldom entered into. After James' death, the trust and comaraderie that had existed between James and John did not manifest itself in the business relationship between John and his nephews.

At the time of James' death in January of 1973, the partnership operation and the various other ventures were all in serious financial difficulty. The Northwestern Mutual Life Insurance Company had obtained a certificate of sale on the foreclose of a mortgage on the land. As of January 4, 1973, Makens Brothers had given the First National Bank of St. Paul, Minnesota, a guarantee in the amount of $1,100,000.00 to secure loans by the bank. In addition, as stated earlier, James and John each had given a personal guarantee to the bank in the amount of $750,000.00. On January 4,

1973, the indebtedness to the First National Bank of St. Paul totaled some $2,674,-000.00.

The redemption period on the defaulted mortgage was extended to March 15, 1975. As a junior lien holder, the First National Bank of St. Paul exercised its statutory right to redeem by purchasing the sheriff's certificate of sale, which resulted in the issuance of a sheriff's deed to the farmland to the bank on April 15, 1975. In an attempt to help the nephews save the land, E.C. Rhodes, an Aberdeen investment banker and mortgage broker, who had a good deal of confidence in Raymond Makens and his mother, purchased the farmland from the First National Bank of St. Paul and had the title placed in the name of one of his employees, who on October 20, 1975, sold the land to the nephews.

At the time of James' death, negotiations were underway to purchase Harlan Palmquist's shares in Cattle Company. On or about January 24, 1973, Palmquist transferred his interest in Cattle Company to John. At the time the nephews executed the January 1974 contract for deed, they were unaware of the fact that John had acquired Palmquist's stock in Cattle Company to the exclusion of their father's interest therein.

In May of 1973 the nephews formed a corporation entitled Makens Brothers Investments (M.B.I.).

Richard became involved in the operation of CMS in 1970 or 1971, at a time when the corporation was losing a million dollars a year. He devoted his efforts over the next several years to try to help CMS survive as an ongoing business. To that end, he and his brothers invested some $25,000.00 to $35,000.00 in the corporation after James' death. In September of 1973, John offered to give the nephews 50,000 shares of preferred stock in CMS. In November of 1973, John was removed from the board of directors of CMS. In January of 1974, CMS "caved in."

Early in 1974, John and the nephews decided that their joint ventures should

cease and that their respective interests should be resolved. This task was virtually impossible at that time because the parties did not hold title to the real estate and there was no way to determine what the costs would be in money, credit, and effort to redeem the farmlands and restore them to the ownership of the Makens family. Moreover, the informal accounting procedures used by John and James during their business relationship made it extremely difficult to delineate their respective equities in the farming operation upon James' death.

It clearly appears from the record that all of the parties involved had a great deal of faith in James' son Raymond. Raymond was given the responsibilities of developing a redemption program for the Makens' farmland and of operating the farm. Furthermore, it is clear that it was the desire of all parties concerned, including John, that Raymond be permitted to utilize all of the Makens' properties to accomplish this purpose. Raymond, who died on November 11, 1979, was largely responsible for any semblance of order brought to the complex and convoluted business dealings regarding the farming operation.

At a meeting of the nephews and John in Chicago on January 24, 1974, M.B.I. executed a contract for deed in which it agreed to sell to Cattle Company approximately 2,673 acres of the Makens' farmland. The purchase price was set at $125,000.00, payable January 31, 1977. On the same date a memorandum of agreement was entered into that attempted to define the obligations of John Makens and M.B.I. This agreement provided, among other things, that John and his wife would convey to M.B.I. all of their interest in the South Dakota real estate, and that M.B.I. would assume and pay the mortgage on the land held by the First National Bank of St. Paul, as well as to transfer its shares of CMS stock to John and his wife.

With respect to the execution of the January 1974 contract, the trial court permitted Richard to testify that John had called him and asked the nephews to come to Chicago. They did so, meeting with John in the office of a Chicago attorney. The conversation consisted of a discussion concerning the possibility of the nephews' taking over CMS. Richard testified that at the time he and his brothers signed the contract for deed they were under the impression that they owned at least half, if not 100%, of Cattle Company because of the fact that it had been pledged to M.B.I. and also because their father had an ownership interest in it. Richard also testified that it was never intended that the contract for deed be enforced. He further testified that John had asked his brothers and him to sign the contract and related documents because "I need these to save my house out in Park Ridge, and they don't really mean anything, but we will agree later on if you guys get the financing, we will sit down and work something out." The related documents included the memorandum agreement, quit claim deed, releases, corporate minutes, and the like. Again, Richard testified that in response to questions from his brothers and himself John answered, " 'Well, just sign the thing.' He said, 'I am in trouble with my house and the whole bit. I need to transfer my assets personally because you know what kind of financial trouble I am in, Rich,' and we said, 'Okay.' So Mike, and I, and Ray walked outside, and I said to Ray, I said, 'Well, we own Clark County Land and Cattle Company anyway'—." Richard testified that in response to his statement that the contract was to be used by John only to save his house and that it should never be filed, John replied, "I will never file it." "I appreciate you boys doing this for me. I will make it up to you some day."

The contract for deed was amended on January 3, 1977, to extend the payment date to January 31, 1978.

Cattle Company brought an action for specific performance of the contract for deed and for a judgment for unpaid rental. The trial court determined that although it could glean sufficient evidence from the record to support specific enforcement of the contract for deed, there was also suffi-

cient evidence to support a finding that it should not be performed but rather declared to be null and void.

The foregoing procedural and factual summary is a highly abbreviated account of the events that gave rise to the actions that resulted in this appeal. As pointed out in the trial court's comprehensive memorandum opinion, which it adopted as its findings of fact after rejecting the proposed findings submitted by the parties, many of the acts carried out by the parties were in the nature of subterfuge, designed to accomplish an ulterior motive and to avoid the possibility of a destruction of the family business ventures. After thoroughly reviewing the evidence, the trial court found that many of the legal instruments signed by the parties had been executed for a limited purpose, and not necessarily for the purpose appearing on the face of the instruments themselves. The court found that certain of the instruments were executed merely to establish the fact that John had some interest of some nature in the Clark County real estate. As indicated above, the court further found that it became the prevalent practice of the parties to enter into an agreement and then to ignore totally its mandates and treat it as if it had no validity.

The trial court found that at the time the parties entered into the January 24, 1974, contract for deed they all agreed that John had some interest in the real estate described therein. The court also found that the parties did not know and could not agree exactly what that interest was, and that the $125,000.00 purchase price set forth in the contract was chosen merely to indicate that John had some interest in the land, an interest that would have to be determined at a later time. The court further found that John and the nephews had agreed at the time the contract was signed that Raymond should use his best efforts to redeem the property from foreclosure and that after the redemption was completed the respective shares of the parties would be determined by balancing the equity that John had at the time of the execution of the contract with the contributions made by the nephews in money, personal credit, work, personal credibility and effort in regaining the ownership of the real estate.

The trial court determined that for the purposes of the case before it, John's interests and liabilities were the same as those of Cattle Company and the interests and liabilities of M.B.I. were the same as those of the heirs of James Makens and of the nephews. The court expressly stated that it would make no determination regarding the ownership of either Cattle Company or M.B.I.

The trial court ordered M.B.I., Michael, Richard, and Shirley Makens (the administratrix of Raymond's estate), to convey an undivided one-half interest in all the real estate described in the contract for deed, excluding a portion previously sold, to Cattle Company free and clear of all encumbrances in settlement in full of all obligations owed to Cattle Company and to John.

The trial court also made determinations regarding current real estate taxes, ownership of grain storage facilities, and John's right to receive a share of the 1982 crops.

## DECISION

At the outset, we must determine whether this is a final judgment and thus appealable as of right or whether it is a partial judgment and therefore not appealable inasmuch as the trial court did not declare the judgment to be final and did not enter an express determination that there was no just reason for delay. SDCL 15–6–54(b). *See Ochs v. Northwestern Nat'l Life Ins. Co.*, 254 N.W.2d 163 (S.D.1977). We raised this issue on our own motion and directed the parties to address it during oral argument.

We conclude that although the judgment does not adjudicate all of the claims or rights and liabilities of all of the parties inasmuch as the trial court did not determine the rights and liabilities of the parties in Cattle Company and M.B.I., with the

result that the determination of that issue, and perhaps others, will have to be resolved in further proceedings, in the interests of judicial economy and in recognition of the fact that the matter has been pending far too long in this court, we will treat the judgment as being properly before us. Cf. *Northwestern Engineering Co. v. Ellerman*, 69 S.D. 397, 10 N.W.2d 879 (1943).

■ Cattle Company attacks as clearly erroneous the finding that the contract for deed was merely a memorialization of John's unascertained interest in the land. We do not agree. As indicated above, we have not detailed all of the evidence that was presented before the trial court. Suffice it to say that a good deal of the testimony was conflicting. Accordingly, after giving due regard to the trial court's opportunity to judge the credibility of the witnesses, SDCL 15–6–52(a), we conclude that the trial court's findings with respect to the intended effect of the contract for deed and the other legal instruments in question is not clearly erroneous. *In re Estate of Hobelsberger*, 85 S.D. 282, 181 N.W.2d 455 (1970).

Cattle Company next argues that the trial court erred in considering parol evidence to vary the terms of an unambiguous written document. Again, we disagree.

SDCL 53–8–5 provides:

The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

In *McCollam v. Littau*, 307 N.W.2d 144 (S.D.1981), we reaffirmed our long-standing rule that in the absence of fraud or mistake, evidence of a contemporaneous parol agreement is not admissible where the written contract is complete and unambiguous.

■ Notwithstanding the foregoing statute and our decisional law, we conclude that the trial court properly considered parol evidence in question under the rule that oral testimony is admissible to show that a written document was never intended to be a contract or to be of any binding force between the parties. *Cooper v. Cooper*, 3 Cal.App.2d 154, 39 P.2d 820 (1934); *P.A. Smith Co. v. Muller*, 201 Cal. 219, 256 P. 411 (1927); *Hamilton v. Boyce*, 234 Minn. 290, 48 N.W.2d 172 (1951); *Coffman v. Malone*, 98 Neb. 819, 154 N.W. 726 (1915). As the Supreme Court of Colorado has held:

We believe it to be a well-settled rule in Colorado and elsewhere that in an action on a contract executed by the parties thereto extrinsic evidence is admissible to establish that the parties did not intend it to be an exclusive, authoritative memorial of their agreement, and where they have previously agreed that their written promises are not to bind them, that agreement controls, and no legal obligations whatever arise under the contract. Such a contract is a mere sham, lacking all legal efficacy, and extrinsic parol or other extrinsic evidence will always be received on the determination of that issue.

*McGuire v. Luckenbach*, 131 Colo. 333, 339, 281 P.2d 997, 1000 (1955). *See also Cosper v. Hancock*, 163 Colo. 263, 430 P.2d 80 (1967). *See generally* 30 Am.Jur.2d *Evidence* § 1034 (1967); Annot. 71 A.L.R.2d 382 (1960).

■ We conclude, therefore, that the trial court properly considered parol evidence in reaching its determination that the parties did not intend the January 24, 1974, contract for deed to be of binding force and effect between them. Accordingly, the trial court did not err in adjusting the equities of the parties based upon the evidence presented to it.

The judgment is affirmed, and the case is remanded to the circuit court for further proceedings to determine the respective interests and liabilities of the parties with respect to Clark County Cattle Company and M.B.I., together with any other issues that may remain unresolved. No costs to be taxed against any of the parties.

FOSHEIM, C.J., MORGAN, J., and DUNN, Retired Justice, concur.

HENDERSON, J., dissents.

WUEST, Circuit Judge, Acting as Supreme Court Justice, not participating.

HENDERSON, Justice (dissenting).

## PROCEDURAL BACKGROUND/HOLDING BELOW

The title to this appeal is deceiving. Plaintiff-appellee, National Boulevard Bank of Chicago, is a plaintiff in one of the actions joined for trial. Several cases were consolidated for trial. This particular appeal is taken from an action wherein the Clark County Cattle Company is plaintiff. Clark County Cattle Company brought an action for specific performance of a contract for deed to sell real estate in Clark County, South Dakota, with an additional request for past-due rent. National Boulevard Bank of Chicago instituted suit against one John J. Makens and others. Clark County Cattle Company is a garnishee-defendant in the latter suit.

Clark County Cattle Company does not dispute that its interest is subject to a lien via a judgment in favor of the National Boulevard Bank of Chicago in the amount of $141,779.86. National Boulevard Bank of Chicago, notwithstanding a judgment awarded below, has filed a Notice of Review. Said Bank joins with the Clark County Cattle Company in its position that the circuit court erred in failing to grant specific performance of the contract for deed in question. However, and pointedly, said Bank maintains that the circuit court should have declared that the Bank has a lien upon all of the land and not on just one-half thereof for the amount of its judgment against John J. Makens and by virtue of the garnishment against Clark County Cattle Company. In the Bank's briefing and Notice of Review, it essentially supports the legal positions of the Clark County Cattle Company. Conversely, the Clark County Cattle Company appears to support the basic positions of the Bank.

Perhaps it is not conceptually fundamental, in appreciating the legal issue in this case, to totally understand the judgment rendered by the circuit court. Nonetheless, I shall set forth same so that the reader may comprehend an overall view of the case. After violating a cardinal rule of substantive law, the parol evidence rule, and permitting a copious amount of oral testimony to vary, alter, and modify the contract for deed, the circuit court entered a judgment (a) which divided the real property described in the contract in half, a one-half undivided interest to M.B.I., Inc., Michael Robert Makens, Richard Makens, and Shirley Makens, administratrix of the estate of Ramond Joseph Makens, deceased, plus certain monetary credits; and a one-half undivided interest to the Clark County Cattle Company and John J. Makens, less certain monetary credits; (b) which required the Makens nephews to provide abstracts to the property and convey the undivided one-half interest to the Clark County Cattle Company free from all liens except real estate taxes; and (c) which required that the said Cattle Company receive a landlord's share of crops of the year 1982, and subsequent years.

## THE CONTRACT FOR DEED

### Its Creation

Exhibit 10, received in evidence, was a contract for deed entered into between M.B.I., Inc., seller, and Clark County Cattle Company, buyer. Seller agreed to sell 2,672.85 acres of farmland for $125,000. Buyer was to have immediate possession. These 2,672.85 acres were formerly partnership ground. In actuality, the Clark County Cattle Company is the John J. Makens family corporation. M.B.I., Inc., is essentially the Makens brothers, the sons of James Makens. The $125,000 consideration set forth in the contract represents the amount upon which the parties agreed was owed by the John J. Makens family to the James Makens family after the partnership assets were divided in accordance with a Memorandum of Agreement, Exhibit 2

(also received into evidence), and Exhibit 10, the contract for deed. Valuable consideration passed when this contract for deed was formally entered into; this included quitclaim deeds from John J. Makens to M.B.I., Inc., of approximately 3,200 acres of land. It is unfathomable to me how these brothers—nephews—corporation—call them or it what you will—can seek to rescind or renounce a formal contract upon which they have affixed their signatures and under which they or it keep economic fruits therefrom, including the balance of the 5,850 Clark County acres of land via the quitclaim deeds.

### Its Reaffirmation

Per Exhibit 12, received in evidence, in January 1975 an agreement was entered into between the same parties. This document identified the contract for deed, contemplated that an extension of time for redemption had been granted, *provided that the contract for deed was to be enforceable by specific performance* and gave M.B.I., Inc., an option to purchase the property back. However, this option was never exercised.

### Its Redeclaration

Per Exhibit 13, received in evidence, a "Supplement to Contract for Deed" was executed in January 1977, which again identified the contract for deed and extended the time for making the final payment for one year plus it specified the terms of rental by which the Makens brothers were renting the land from the Clark County Cattle Company. Surely, then, these brothers recognized that they did not own the land and were bound by their previous agreement, for, as disclosed, they were renting the land. Exhibit 13 redeclared the original contract for deed.

Summarizing, the contract for deed was validly created with a valuable consideration flowing, was reaffirmed once, and later redeclared as being a binding agreement between the parties. As I have above written, the parties specifically placed in writing that the contract for deed was enforceable by specific performance.

## ISSUE PRESENTED

Factually and procedurally, this case appears extremely complicated. It is elementary, after reading through the historical morass spawned by the oral testimony, that this appeal arises from one document (a contract for deed) and one claim for requested relief (specific performance) with one basic ruling. We are simply confronted with this issue: Was it error for the circuit court to entertain evidence of prior or contemporaneous negotiations or agreements to vary and change a contract for deed? I would hold that it was error and would reverse and remand with instructions.

## APPLICABLE LAW

We have before us, to examine, a contract for deed dated January 24, 1974, which appears to be complete, clear, unambiguous, and containing mutual contractual covenants. Valuable consideration passed. Parties thereto altered their position. True, the circuit court has read this contract for deed and permitted parol evidence to decide that the contract was only a memorandum. However, this Court may read the contract for deed without any presumption in favor of the circuit court's determination. *McCollam v. Littau*, 307 N.W.2d 144, 145 (S.D.1981). We should recognize, additionally, in reviewing the circuit court's action and workings upon this contract, that the circuit court did not make any finding of ambiguity. As the contract for deed contemplates a specific agreement between the parties, it was error for the circuit court to force a compromise upon the parties. No litigant questions that the circuit court did not specifically enforce the contract; yet, the circuit court saw fit to impose radically different terms on both parties within the framework of the contract which it refused to enforce.* This

---

* The circuit court cut the baby in half. In this action of specific performance to require a conveyance of approximately 2,672.85 acres of land (less one conveyance of 320 acres therefrom,

cannot be. The circuit court cannot make a new contract for the parties. *Pam Oil, Inc. v. Travex Int'l Corp.*, 336 N.W.2d 672 (S.D.1983).

The circuit court made a finding that the contract for deed was intended to be a memorialization of the fact that John J. Makens had an interest, the value of which was to be later determined. Of course, this is contrary to what the parties agreed upon. Basically, the circuit court decision was that a formal contract for deed was nothing more than a memorandum and a memorandum which attempted to trace the realistic interests of John J. Makens and others. Parol evidence was considered by the circuit court to vary and change the terms of the written contract which was unambiguous on its face. This is contrary to state statute, namely, SDCL 53–8–5, and the decisional law of this state. As recent as 1983, this Court in *Flynn v. Flynn*, 338 N.W.2d 295, 296 (S.D.1983), expressed:

> This court has repeatedly held that parol evidence should not be admitted where the meaning of a contractual provision is patently clear. *North River Ins. Co. v. Golden Rule Const.*, 296 N.W.2d 910 (S.D.1980), citing *Delzer Const. Co. v. South Dakota State Bd. of Transp.*, 275 N.W.2d 352 (S.D.1979).

The circuit court took evidence concerning the intention of the parties as to their contractual agreement by receiving parol evidence. The circuit court did not enforce the contract as it was written and, in my opinion, it should have. The oral negotiations or stipulation of the parties, which preceded or accompanied the execution of the contract for deed, are all superseded by the parties entering into the formal contract for deed.

Contrary to the label affixed unto it, the parol evidence rule is not a rule of evidence; it is a substantive rule of law. It requires that the final expression of parties shall prevail over antecedent or contemporaneous deals, negotiations, expressions, and understandings. 9 Wigmore, Evidence

§ 2400 (Chadbourn rev. 1981); *Janssen v. Tusha*, 66 S.D. 604, 287 N.W. 501 (1939).

This Court has always strictly applied the parol evidence rule. Here, per the majority opinion, it appears that we will have a deviation from long-settled precedent because of a new concept allegedly fostered by the unique facts in this case. The majority opinion relies upon outside authority to open up the door on parol testimony to establish that the written document here, namely, a contract for deed, was never intended to be a contract or to be of any binding force between the parties. In effect, the majority opinion sustains the circuit court in its holding that parol evidence was admissible to change a contract. For, the inconsistency of all of this, under these facts and circumstances, is that the circuit court has recognized the contract for deed enough and to such extent to build a new contract arising from it. Not wishing to engage in pedantic discourse nor in scholarly miniutiae, but sorely concerned with the practical outfall of the majority opinion's approval of the Colorado authorities, I would ask: Where does this take us down the road—to a point in time where critical evidentiary rulings are made in our South Dakota trial courts? To that evidentiary crucial moment when the trial judge must decide: Should I permit this parol evidence to establish that the parties *really* did not intend to contract at all? Musing further, with that trial judge who finds himself in that tender moment, should this extrinsic evidence be received into evidence to establish that there exists another agreement— perhaps establishing that the contract vividly before me is simply a memorialization and not a contract at all? If such evidence is a progenitor of that which is admissible hereafter in the courts of our state, then it would best serve the stability of contract law that certain findings be first established. As subsequently noted, such findings were not established here and the record is silent upon which to predicate an

agreed upon by the parties), the circuit court ordered a conveyance of an undivided one-half

of the aforementioned 2,672.85 acres unto buyer.

about-face on law that is soundly entrenched in this state.

During the course of this trial, the circuit court expressed that it would receive testimony for the purpose of showing "that the Contract for Deed is not an instrument at all. . . ." There is no finding, in the decision, that the contract for deed was not an instrument at all. Furthermore, the court made no finding of fraud, mistake, or accident, and did not find that the contract was ambiguous. In the absence of fraud, mistake, or accident, a written agreement which is complete, clear, and unambiguous in its terms and contains mutual contractual covenants (such as found here and which were implemented) cannot be changed or modified by parol or extrinsic evidence. *Farmers' Elevator Co. v. Swier*, 50 S.D. 436, 210 N.W. 671 (1926). As I mentioned above, our Court has historically applied the parol evidence rule in a most strict manner. In *Janssen v. Tusha*, 287 N.W. at 504–05, we quoted Judge Learned Hand in his opinion in *Eustis Mining Co. v. Beer, Sondheimer & Co., Inc.*, 239 F. 976, 984 (S.D.N.Y.1917):

It makes not the least difference whether a promisor actually intends that meaning which the law will impose upon his words. The whole House of Bishops might satisfy us that he had intended something else, and it would make not a particle of difference in his obligation. That obligation the law attaches to his act of using certain words, provided, of course, the actor be under no disability. * * * Hence it follows that no declaration of the promisor as to his meaning when he used the words is of the slightest relevancy, however formally competent it may be as an admission. Indeed, if both parties severally declared that their meaning had been other than the natural meaning, and each declaration was similar, it would be irrelevant, saving some mutual agreement between them to that effect. When the court came to assign the meaning to their words, it would disregard such declarations, because they related only to their state of mind when the contract was made, and that has nothing to do with their obligations.

Additionally, we should observe that there were no findings below that this contract for deed was in violation of public policy, a sham, or unsupported by a valuable consideration. Neither were there findings that the contract was vague, indefinite, or incomplete. Under SDCL 21–9–3, if a contract is unfair and unreasonable, a court will not require a party to specifically perform; here, there was no finding that the contract was unfair and unreasonable. Under SDCL 21–9–4, if there is a lack of mutuality of remedy, a court will not require specific performance against a party; here, there was no finding that there was a lack of mutuality. In essence, there are no findings in the circuit court's decision (a) to base the unenforceability of the contract or (b) upon which to predicate a foundation for the admission of parol evidence. Therefore, the equitable powers of the circuit court "in adjusting the equities of the parties"—to use the vernacular of the majority—could not be inceptually or conceptually induced. This contract for deed, fairly bargained for, certain in expression, and formally entered into, and thereafter implemented by the passing of valuable consideration, not to mention two express declarations in writing that the contract for deed was reaffirmed and redeclared and subject to specific performance, is entitled to enforcement. *McDonald v. Miners & Merchants Bank, Inc.*, 310 N.W.2d 591 (S.D. 1981). Ultimately, an equity brush, with strokes of compromise, painted a different picture inside the framework of the contract than intended by those who bargained.

I would reverse and remand for an order commanding specific performance of the contract for deed; and further require the circuit court to determine the past-due rent owed to the Clark County Cattle Company with a concomitant duty to enter a money judgment in its favor.