In re the **GEORGIA GRANITE COMPANY, INC., Debtor.**

**COGGINS GRANITE, INC. and Coggins Land Company, Individually and Collectively, Movants,**

v.

**The GEORGIA GRANITE COMPANY, INC., Respondent.**

**The GEORGIA GRANITE COMPANY, INC., Plaintiff,**

v.

**COGGINS GRANITE, INC., Coggins Land Company, and First Union National Bank of Georgia, f/d/b/a First Georgia Bank, Defendants.**

**Bankruptcy No. A86–09123–WHD. Adv. No. 87–0601A.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

May 10, 1988.

Paul L. Hanes, Atlanta, Ga., for plaintiff/debtor.

David A. Rabin, Morris, Manning & Martin, Atlanta, Ga., for Coggins Granite, Inc. and Coggins Land Co.

Mary Grace Diehl, Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for First Union Nat. Bank of Georgia.

## ORDER

W. HOMER, DRAKE, Jr.,
Bankruptcy Judge.

This Chapter 11 case is before the Court on a motion for relief from the automatic stay filed by Coggins Granite, Inc. and Coggins Land Company (hereinafter collectively "Coggins"). Following the filing of Coggins' motion, the debtor, The Georgia Granite Company, Inc., initiated adversary proceeding No. 87–0601A to determine the extent and validity of the liens asserted by Coggins.

On September 24, 1987, the date on which Coggins filed its motion, the Court entered a Notice of Assignment of Hearing which set a hearing date for Coggins' motion on November 10, 1987, in order to comply with the thirty-day constraint of 11 U.S.C. § 362(e). The Notice further stated that the automatic stay would remain in effect until the Court ordered otherwise. The hearing date was ultimately reset to January 11, 1988. At that hearing, the debtor, in defense of Coggins' motion, addressed some of the issues raised by the adversary proceeding involving the validity and extent of Coggins' liens. In short, the debtor asserts that it has equity in the properties which are the subject of Coggins' motion because the full amount of the debt owed to Coggins is not secured due to the recording by Coggins of security deeds and mortgages which misstate the amount of underlying debt.

At the conclusion of the hearing on January 11, the Court took the matter under advisement and requested that Coggins and the debtor submit proposed findings of fact and conclusions of law. Following a conference with counsel on January 13, 1988, the Court permitted the other defendant named in the adversary proceeding, First Union National Bank of Georgia, f/d/b/a First Georgia Bank ("First Union"), to file a brief addressing the issues raised in these matters. First Union, which holds second priority security interests on the properties on which Coggins holds a prior interest, had been named as a defendant in the adversary proceeding to enjoin First Union from going forward with its foreclosure pursuant to a previously entered consent order lifting the stay as to First Union. The complaint in the adversary proceeding seeks no further relief against First Union.

The debtor and First Union filed their briefs and other documents within the adversary proceeding file rather than the bankruptcy case file as part of the contested matter. On March 14, 1988, the Court entered an Order in the adversary proceeding which was consented to by all parties and which ordered that the adversary proceeding be held in abeyance pending the resolution of the contested matter. Because there is little, if any, dispute as to the relevant facts in this case, this Order will address both the contested matter (motion to lift stay) and the facts pertinent to the adversary proceeding.

As stated previously, a review of the proposed findings submitted by the debtor and by Coggins reveals very little dispute regarding the relevant facts in this case. The Court will therefore adopt many of the parties' statements of facts in the Court's findings of fact and conclusions of law which follow.

## FINDINGS OF FACT

1. The movants/defendants, Coggins Granite, Inc. and Coggins Land Company, are subsidiaries of Coggins Industries, Inc.

2. On February 13, 1984, Coggins Industries, Inc. and its subsidiaries, including the movants, entered into a "Purchase Agreement" (Plaintiff's Exhibit 1) with the debtor.

3. Pursuant to the Purchase Agreement, Coggins Industries, Inc. and its subsidiaries (hereinafter collectively "Coggins companies") agreed to sell and the debtor agreed to purchase certain assets then owned by the Coggins companies, including certain real estate and personal property.

4. The purchase price to be paid by the debtor included, *inter alia,* $500,000.00 in cash to be paid at closing, plus three promissory notes, one in the amount of $367,000.00, one in the amount of $1,000,000.00, and one in the amount of $2,000,000.00.

5. The Purchase Agreement provides in Section 2(a) that the three promissory notes will be secured by mortgages or deeds to secure debt on the real property conveyed, subordinate only to existing encumbrances, except for certain described properties not at issue here.

6. The Purchase Agreement further provides in Section 2(b) that the Coggins companies shall have a security deed on the real properties conveyed to secure the debtor's obligations.

7. The Purchase Agreement further provides in Section 2(e) that all of debtor's obligations to the Coggins companies shall be secured by mortgages or deeds to secure debt on the real property acquired, subordinate to all existing encumbrances, except for certain described properties not at issue here.

8. The Purchase Agreement further provides in Paragraph 2(d) that the consummation of the purchase and sale was to occur no later than March 2, 1984.

9. On March 2, 1984, the debtor gave the Coggins companies the sum of $400,000.00 as a partial payment of the down payment contemplated in the Purchase Agreement. In addition, on that date, the debtor gave Coggins companies a note in the amount of $100,000.00, representing the remainder of the down payment, another note in the amount of $367,000.00, a third note in the amount of $1,000,000.00, and a fourth note in the amount of $2,000,-

000.00. The notes in the amount of $100,-000.00 and $367,000.00 have been paid and are not part of the debt now claimed by Coggins.

10. It was the understanding of both Coggins and the debtor at the time the Purchase Agreement was signed that the debt of $3,367,000.00 would be secured by all of the non-Georgia real estate being conveyed and two of the Georgia properties that were being conveyed (hereinafter referred to collectively as the "Real Estate"), those being the properties as to which Coggins filed the instant motion.

11. The $1,000,000.00 note and the $2,000,000.00 note were admitted into evidence as Plaintiff's Exhibits 2 and 3. Those notes evidence the debt now claimed by Coggins.

12. Each of the two notes described in the preceding paragraph states that, "To secure the payment of this Note, the [Debtor] has granted to [the Coggins companies] a security interest in certain real estate ..." Each of the notes further provides that in the event the debtor defaults in the payment of installments due thereunder, then the entire unpaid balance would, at Coggins' election, forthwith become due and payable together with interest at the rate of twelve percent (12%) per annum from the time of any such default. Each of the two notes further provides that in case it is collected through an attorney at law, all costs of collection, including fifteen percent (15%) of the principal and interest as attorney's fees, shall be paid by the debtor and shall constitute an additional indebtedness thereunder.

13. On March 2, 1984, the Coggins companies executed papers conveying to the debtor certain of the personal property to be sold pursuant to the Purchase Agreement, but warranty deeds and security instruments for the Real Estate were not signed. The debtor's attorney was to prepare such deeds and instruments.

14. Subsequent to March 2, 1984, Coggins' attorney informed Coggins that he had received some of the warranty deeds and security instruments from the debtor's counsel, covering some of the properties that were to be conveyed to the debtor. He further informed Coggins that in the security instruments, debtor's counsel had used the figure of $3,367,000.00 in each instance. Coggins' counsel further informed Coggins that he was concerned that if that figure was used in each instrument, the purchase price might be overstated and that there would be a substantial amount of taxes that would need to be paid.

15. Representatives of the Coggins companies subsequently discussed the matter with Tony Morris, who at that time was president of the debtor. Mr. Morris authorized Coggins' attorney to reduce the amount of debt stated in the security instruments.

16. The security instruments ultimately signed by Mr. Morris on behalf of the debtor were subsequently recorded in the counties in which the respective parcels of Real Estate were located and were admitted into evidence as Plaintiffs Exhibits 4 through 9 and 13 and 14. These security instruments were recorded in March, 1985 and state the amount of the underlying promissory notes as follows:

| Location | Stated Amount of Note |
| --- | --- |
| Madison County, Ga. | $90,000.00 |
| Kershaw, S.C. | $25,000.00 |
| Culpepper, Va. | $ 1,000.00 |
| Culpepper, Va. | $ 6,000.00 |
| Culpepper, Va. | $50,000.00 |
| Grant County, S.D. | $67,200.00 |
| Iron County, Mo. | $25,000.00 |
| Green County, Ga. | $ 1,000.00 |

17. The debtor did not give Coggins promissory notes in the amounts actually stated in the security instruments.

18. On March 2, 1985, counsel for the Coggins companies wrote to Mr. Morris in a letter which was admitted into evidence as Plaintiff's Exhibit 15 and which states that certain changes had been made in the security instruments with Mr. Morris' express permission. One of the described changes was the decrease in the amount of debt stated in the instruments. The letter further states that the change was being made because of the methods of taxing deeds in the different states where the deeds were to be recorded.

19. In March, 1985, in connection with a transaction to be entered into between the debtor and First Union, the debtor or its counsel requested that Coggins execute an "Estoppel Certificate" stating the present balance of the debt owed by the debtor to Coggins. The Estoppel Certificate (admitted as Plaintiff's Exhibit 10) was signed on behalf of Coggins on March 8, 1985 and states, "The present unpaid balance as of March 8, 1985, on the indebtedness secured by the aforesaid deeds to secure debt and mortgages is $3,268,968.00...." Coggins delivered the Estoppel Certificate to the Secretary of the debtor, Angie Wissing.

20. Accounting records which show the dates and amounts of payments by the debtor on the debt owed to Coggins were admitted into evidence as Plaintiff's Exhibit 12.

21. Both notes to Coggins went into default in 1985 and Coggins sent a notice of default by certified mail, return receipt requested, on February 28, 1986. (Plaintiff's Exhibit 11).

22. By letter dated June 10, 1986, from Coggins' counsel to Mr. Morris, Coggins' counsel notified the debtor that Coggins had declared the total amount of debt to be immediately due and payable on account of the debtor's default and further gave the debtor the notice pertaining to attorney's fees required by O.C.G.A. § 13–1–11. (Plaintiff's Exhibit 16).

23. In July of 1986, the debtor paid $1,000,000.00 to Coggins as part of an attempt to enter into a transaction to restructure the Coggins financing. The transaction was never consummated, and, at the time of the payment, the debtor did not give Coggins any express direction as to the manner in which Coggins was to apply the payment, nor did the debtor condition Coggins' acceptance of the payment upon Coggins' agreement to rescind its notice of acceleration. At the time of the payment, the maturity of the debt had been accelerated and more than ten days had expired since the debtor's receipt of the June 10, 1986 notice. The Court finds that the debtor's payment did not deaccelerate the notes or cure the defaults.

24. By letter dated November 7, 1986, Coggins again notified the debtor that the maturity of the debt had been accelerated and further demand for immediate payment was made. (Plaintiff's Exhibit 17).

25. The transcript of the hearing before this Court on September 1, 1987, on the Motion for Relief from Automatic Stay filed by First Union was admitted into evidence as plaintiff's Exhibit 18. At said hearing, the debtor and First Union agreed that there was no equity in the property of the debtor in which First Union held a security position, which includes the property at issue in the hearing at bar. At that hearing the debtor consented to First Union's motion to allow First Union to proceed with foreclosure.

26. On September 1, 1987, this Court signed the Order granting the relief sought by First Union. Said Order further states that there appears to be no equity in the collateral of First Union which would be of benefit to the estate of the debtor. The debtor consented to said Order by execution by its counsel.

27. Coggins and the debtor stipulated at the hearing in this matter on January 11, 1988 that if the full amount of debt owed by the debtor to Coggins in the amount of approximately $3,000,000.00 is secured by the Real Estate, then the debtor would have no equity in those properties.

28. Coggins and the debtor stipulated at the hearing in this matter on January 11, 1988 that if the full amount of debt owed by the debtor to Coggins is secured by the Real Estate, then the debtor would not be capable of an effective reorganization.

29. Subsequent to the date that First Union was granted relief from the stay, First Union foreclosed on two of the Georgia properties in which Coggins has a security interest.

## CONCLUSIONS OF LAW

If not for the entry of the consent order which lifted the stay as to First Union, the effect of which will be discussed shortly, the Court would have little difficulty in ordering that the stay against Coggins be

continued in effect on the ground that the debtor has shown a sufficiently strong likelihood of success in the adversary proceeding, which would result in a substantial reduction in the secured portion of Coggins' claim.

Outside of bankruptcy there would be no question that Coggins could enforce its entire claim against The Georgia Granite Company as a secured claim. This is so because, in all of the states in which Coggins recorded its security instruments, the law provides that, as between the parties to the instruments, the terms of a promissory note will control over the terms of a recorded mortgage when there is a discrepancy or conflict in the two documents. *See Tipton v. Holt*, 610 S.W.2d 659 (Mo.App.1981); *Harmon v. Bank of Danville*, 287 S.C. 449, 339 S.E.2d 150 (1985); *Janssen v. Tusha*, 66 S.D. 604, 287 N.W. 501 (1938); *Icard v. Harbuck*, 137 Ga.App. 570, 224 S.E.2d 532 (1976).

■ However, once the Georgia Granite Company became a debtor-in-possession by filing its bankruptcy petition, the analysis changes because, by virtue of 11 U.S.C. § 544(a)(3) and § 1107(a), a debtor-in-possession has the rights and powers of a bona fide purchaser of real property that obtains such status as of the commencement of the case. The language of § 544(a) grants the trustee such powers "without regard to any knowledge of the trustee." Likewise, the knowledge of the pre-petition debtor as to the intended extent of the lien should not prevent the post-petition debtor-in-possession from exercising the powers conferred by § 544. *See In re Sandy Ridge Oil Co.*, 807 F.2d 1332 (7th Cir.1986).

Thus, it is irrelevant that Coggins' claim would be an enforceable, fully secured claim against the debtor outside of bankruptcy, that the parties intended for the Coggins' notes to be fully secured by each parcel of Real Estate, or that the debtor had actual knowledge of such intent. The relevant inquiry becomes whether Coggins' security interest could withstand challenge by a bona fide purchaser, whose rights are to be determined under applicable state law. *See In re Fulton Air Service, Inc.*, 777 F.2d 1521 (11th Cir.1985).

In each of the states involved herein, a purchaser is charged with constructive notice of matters contained within recorded deeds which lie in the chain of title for the property in question, and, furthermore, the purchaser may be charged with inquiry notice as to incomplete or inconsistent matters of record or references to outside documents which impose on the purchaser a duty to inquire further. *See Walters v. Tucker*, 308 S.W.2d 673 (Mo.1957); *City of Greenville v. Washington American League Baseball Club*, 205 S.C. 495, 32 S.E.2d 777 (1944); *Aetna Life Insurance Co. v. McElvain*, 363 N.W.2d 186 (S.D. 1985); *Allen v. Green*, 229 Va. 588, 331 S.E.2d 472 (1985); *Mattlage v. Mulherin*, 106 Ga. 834, 32 S.E. 940 (1899).

The arguments raised by Coggins that their recorded security instruments contain sufficient facts or ambiguities which would impose a duty to inquire upon a prudent purchaser who searched the records are not entirely convincing. Coggins asserts that the references in some instruments to the nonexistent notes being payable to the terms and conditions set forth in a certain *agreement* between the parties is enough to require a prudent purchaser to inquire as to the terms of the agreement, which inquiry would then lead to the discovery of the correct amount of the debt. As to other security instruments, Coggins relies upon the fact that each of them refers to a nonexistent promissory note at one point, but later references "notes" (plural). The Court is unconvinced that such minor ambiguities in the recorded instruments would result in the imposition of a duty to inquire upon a purchaser. (Indeed, these ambiguities which Coggins now relies upon were apparently not sufficient to cause the taxing authorities of the various states to inquire as to whether the instruments correctly stated the amounts of the underlying debts). Unfortunately for the debtor and in spite of the debtor's showing of a likelihood of success in the adversary proceeding, the Court finds Coggins' remaining argument in favor of lifting the stay more persuasive.

■ Coggins argues that the debtor is collaterally estopped from asserting that there is equity in the Real Estate because that issue was previously litigated and resolved by the consent order which lifted the stay as to First Union. The three essential elements for the application of the collateral estoppel doctrine to preclude a party from litigating an issue are: (1) an identical issue; (2) actually litigated in a prior suit; and (3) which prior suit could not have been resolved without a resolution of the issue. *In re Raiford,* 695 F.2d 521, 523 (11th Cir.1983).

The debtor's and First Union's first argument against applying collateral estoppel under the facts of this case is that the issue of the debtor's equity was not actually litigated but was instead resolved by agreement.

■ A consent order may be given collateral estoppel effect if the parties intended the order to be conclusive as to a particular issue. *Balbirer v. Austin,* 790 F.2d 1524 (11th Cir.1986). In the case at bar, First Union's motion to lift the stay cites the debtor's lack of equity as grounds for relief, and this issue was addressed both at the hearing on First Union's motion and in the consent order which granted the motion. It therefore appears that the debtor and First Union intended for the consent order to be conclusive as to the question of whether the debtor had any equity in the properties involved.

The debtor also asserts that it should not be collaterally estopped from claiming that it has equity in the Real Estate because new evidence has been discovered since the time the consent order was issued. At the time the debtor consented to the lifting of the stay as to First Union, the debtor believed that it had no equity because it was under the impression that its entire debt to Coggins was subject to a valid security interest. Following the entry of the First Union consent order, the debtor discovered its "new evidence" in the form of the copies of the security instruments which Coggins had attached to its own motion to lift stay.

■ Newly discovered evidence may preclude application of the collateral estoppel doctrine if the party against whom collateral estoppel is asserted was deprived of crucial evidence in the prior litigation without fault of his own. *See e.g. Butler v. Stover Brothers Trucking Co.,* 546 F.2d 544 (7th Cir.1977) (estoppel not applied because court in prior case excluded certain evidence). Here, however, the security instruments in question were executed by the debtor's officers and were therefore known to the debtor, if not to the debtor's attorney. The documents were also matters of public record which were readily available to the debtor prior to the hearing on First Union's motion. Under these circumstances, the documents simply cannot be considered "new evidence" so as to preclude the application of collateral estoppel.

The final argument against Coggins' assertion of collateral estoppel involves the special concerns raised by the "offensive" use of the doctrine, that is, the assertion of collateral estoppel by a plaintiff (or movant) rather than by a defendant (or respondent). The Supreme Court has addressed the differences between the offensive and defensive uses of the doctrine as follows:

First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." ... Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment.... Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will

have everything to gain and nothing to lose by not intervening in the first action. A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously.... Still another situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result....

We have concluded that the preferable approach for dealing with these problems in federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive collateral estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 329–31, 99 S.Ct. 645, 650–52, 58 L.Ed.2d 552 (1979) (citations and footnotes omitted).

It appears to this Court that the key concern raised by the Supreme Court is that the defendant must have had a similar opportunity and incentive to defend vigorously in the prior suit as is present in the subsequent suit. The debtor in this case clearly had an equal incentive to defend against First Union's motion for relief from stay as is present with regard to Coggins' motion. Also, the opportunity to present a defense was equally present at the time of First Union's motion. As stated earlier, nothing which can properly be said to be "new evidence" has become available since the time of the entry of the consent order.

The Court must therefore conclude that the debtor is collaterally estopped from asserting that it has equity in the properties which constitute Coggins' collateral.

Accordingly, it is ORDERED that Coggins' Motion for Relief from Stay filed on September 24, 1987, is GRANTED; and it is

FURTHER ORDERED that this Order be filed in the above-referenced Chapter 11 case and adversary proceeding and that the Clerk shall serve a copy of this Order on all parties to the adversary proceeding.