# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 01-3522

_____

Liberty Mutual Insurance　　　*
Company,　　　　　　　　　　*
　　　　　　　　　　　　　　*
　　　　　　Appellee,　　　　*　Appeal from the United States
　　　　　　　　　　　　　　*　District Court for the
　　　v.　　　　　　　　　　*　Western District of Missouri.
　　　　　　　　　　　　　　*
FAG Bearings Corporation,　　*　　　　[PUBLISHED]
　　　　　　　　　　　　　　*
　　　　　　Appellant.

_____

Submitted:　September 9, 2002
　　　Filed:　July 10, 2003

_____

Before HANSEN,[1] Chief Judge, LAY and MURPHY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Liberty Mutual Insurance Company (Liberty), a general liability insurer, filed a declaratory judgment action seeking a determination that it had no duty to defend or indemnify one of its policyholders, FAG Bearings Corporation (FAG), in various class actions and administrative proceedings arising out of environmental

---

[1]The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

contamination at FAG's Joplin, Missouri plant. The district court[2] granted Liberty summary judgment, finding that FAG was precluded from relitigating the relevant issues regarding coverage because they had been decided in an earlier action between Liberty and FAG, and alternatively, that the liability insurance policy did not cover the alleged acts potentially giving rise to FAG's liability in the underlying suits. Furthermore, the district court concluded that the insurance policy did not create a duty to defend in administrative proceedings. For the reasons stated below, we affirm.

## I. BACKGROUND

This is the second time these two parties have appeared in a case before this court.[3] In 1994, Liberty brought a declaratory judgment action (LM I), seeking to determine its obligation under a liability policy to defend and indemnify FAG in two civil actions, Lewis v. FAG Bearings Corp. ("the Lewis action") and Thomas v. FAG Bearings Corp. ("the Moretz Action"), and two administrative proceedings involving the EPA and the Missouri Department of Natural Resources (MDNR). The district court in LM I ("the LM I court") found that recurring malfunctions in FAG's trichloroethylene (TCE) reclamation system at its Joplin plant caused airborne emissions that led to the groundwater contamination, property damage, and bodily injury giving rise to the underlying actions. See Liberty Mut. Ins. Co. v. FAG Bearings Corp., No. 94-0241, slip op. at 1-3, 9-10 (W.D. Mo. May 14, 1996). In

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

[3]The underlying facts in this case have been detailed in a number of earlier opinions. See Liberty Mut. Ins. Co. v. FAG Bearings Corp., 153 F.3d 919 (8th Cir. 1998); FAG Bearings Corp. v. Gulf States Paper Co., et al., No. 95-5081 (W.D. Mo. Sept. 30, 1998); Liberty Mut. Ins. Co. v. FAG Bearings Corp., No. 94-0241 (W.D. Mo. May 14, 1996); Lewis v. FAG Bearings Corp., 5 S.W.3d 579 (Mo. Ct. App. 1999).

granting Liberty's motion for summary judgment, the LM I court found that these releases fell within the pollution exclusion clause in FAG's liability insurance policy because they were not "sudden and accidental."[4]  Id. at 9-10.  The LM I court noted in its summary judgment order and in a subsequent order denying FAG's motion to alter and amend judgment, that its ruling in the case did not determine the parties' rights in other pending or future actions.

FAG filed a Rule 60(b) motion for relief from judgment in LM I on the basis of "newly discovered evidence," specifically, expert reports used against it in a related contribution action (Gulf States) showing that FAG released TCE in a number of ways other than through airborne emissions.  The court in Gulf States, notably the same court as that in LM I, found that in addition to the faulty vapor recovery system, FAG lost between 11,000 and 24,000 gallons of TCE through pump malfunctions, "still bottoms" generated during distillation of TCE, collection tank overflows, leaking barrels, dumping, incidental use by employees, and seal leaks in the vault. See FAG Bearings Corp. v. Gulf States Paper Co., et al., No. 95-5081, slip op. at 6-27 (W.D. Mo. Sept. 30, 1998).  The LM I court denied FAG's motion, finding that FAG had not exercised due diligence in discovering the other sources of release, that the

_____

[4]In 1982, Liberty began insuring FAG through a series of general and excess liability policies.  The policies contain a pollution exclusion clause limiting FAG's coverage as follows:

> This policy does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Id. at 4 (internal quotations omitted).

evidence was merely cumulative, and that FAG did not even assert that any of the new sources of contamination were "sudden and accidental."

On appeal, we affirmed the LM I court's judgment. See 153 F.3d at 922. We held that FAG had failed to put forward evidence creating a genuine issue of material fact as to whether there were releases of TCE other than the vapor emissions that were "sudden and accidental." Id. We noted that although the complaints in the underlying suits alleged other methods of release, the undisputed evidence in the Moretz action related only to vapor releases through the TCE reclamation system, and FAG failed to put forward evidence to create an issue to the contrary. In affirming the LM I court's denial of FAG's Rule 60(b) motion, we agreed that FAG had failed to exercise due diligence in discovering the new evidence. Id. at 924.

In 1999, Liberty filed the complaint in this action (LM II), seeking to determine its obligation to defend and indemnify FAG in two civil actions, the Lewis action and Black v. FAG Bearings Corp., and the administrative proceeding involving the EPA. FAG filed a counterclaim, seeking reimbursement for defense costs and indemnification in these actions as well as the MDNR investigation. At some point after the complaint was filed, the parties amended their pleadings to add the case of Hughes v. FAG Bearings Corp. to the list of underlying suits for which FAG was seeking coverage.

The Lewis action was filed in 1992 and resulted in a jury verdict of $716,000 in compensatory damages and $1,250,000 in punitive damages. The punitives were set aside by the trial court. In September 1999, the Missouri Court of Appeals affirmed the judgment which awarded compensatory damages to Lewis and which abrogated the jury's award of punitive damages. See Lewis, 5 S.W.3d at 588. The evidence in Lewis was based almost entirely on FAG's allegedly improper TCE storage and disposal practices during the years it utilized TCE in it operations. Id. at 582-83. The Black action was filed in 1996 and settled in 2000 after the discovery

4

of new scientific evidence. The <u>Hughes</u> action was filed in 1999 and is still pending in Missouri state court.

The MDNR began its investigation of the Joplin facility in 1992. After determining that FAG was a "potentially responsible party" for the groundwater contamination, the MDNR demanded that FAG remediate the contamination and fund a new public drinking water system. In 1998, FAG entered an Abatement Order on Consent with the MDNR, requiring FAG to conduct an investigation and remediation at the Joplin facility. In September 1991, the EPA sent an information request to FAG regarding the Joplin site. In January 1998, the EPA simultaneously filed a complaint seeking reimbursement for response and removal costs at the Joplin facility, and an agreed upon consent decree under which FAG must pay $223,057.

FAG alleges for the first time in <u>LM II</u> that the contamination giving rise to the underlying claims resulted when a plumbing contractor working for FAG cut an underground, abandoned pipeline on FAG's property in 1983 or 1984. The pipeline was originally used to transport TCE and was allegedly drained and capped in 1982 when FAG stopped using the chemical. Some months later, FAG directed that the pipe be cut for use in a new reverse-osmosis system, at which time a clear liquid flowed from the pipe. The only FAG employee to witness this event believed that the liquid was water and directed the plumbing contractor to continue his work. Varying testimony indicates that the liquid continued to flow into the ground for at least thirty minutes, and for up to two hours after the cut. Later evidence indicated that the liquid was actually TCE that had remained in the pipe after it was capped in 1982.

According to FAG, the first evidence of the pipeline cut was discovered in 2000 by its adversaries in other litigation. FAG alleges that the concentration of TCE in the pipeline trench is 10,000 times greater than any other location at its Joplin facility. Based on the opinions of its experts, FAG asserts that the TCE released from the pipe cut was the primary, if not the exclusive, source of contamination in the

5

surrounding groundwater, and that its discovery proves that the conclusions of the LM I court as to the source of contamination were erroneous. FAG argues that the release from the pipe was "sudden and accidental" and, therefore, covered under the Liberty policy.

In an order granting partial summary judgment in LM II, the district court found that the decision in LM I precludes FAG from relitigating the issue of Liberty's obligation to defend and indemnify FAG in other actions based on TCE releases. The court, on its own initiative, also went on to find that even if it was to consider evidence of the pipe cut as a source of TCE contamination, releases from the cut were not "sudden and accidental" and, therefore, fall outside the policy's coverage. Finally, the court determined that Liberty owes no duty to defend or indemnify FAG in the administrative proceedings, because they are not "suits" within the coverage of the insurance policy. FAG appeals the judgment, challenging the district court's application of issue preclusion, its finding that releases from the pipe cut were not "sudden and accidental," and its conclusion that the administrative proceedings are not "suits."

## II. DISCUSSION

In reviewing the district court's grant of summary judgment, we review de novo its conclusions of law, see Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1196 (8th Cir. 2002), including the availability of issue preclusion, see Boudreau v. Wal-Mart Stores, Inc., 249 F.3d 715, 719 (8th Cir. 2001) ("A trial court's determination as to whether the legal prerequisites for issue preclusion have been met on the facts before it is a mixed question of law and fact, subject to de novo review by this court."). Therefore, if issue preclusion is unavailable as a matter of law, we owe no deference to the district court's decision to apply that doctrine.

6

Liberty argues that we must apply an abuse of discretion standard of review. We disagree. A number of courts have concluded that although the availability of issue preclusion is subject to de novo review, because the district court has broad discretion to determine whether the doctrine should be applied when available, appellate courts should review this secondary decision for an abuse of discretion. See United States v. Sandoz Pharms. Corp., 894 F.2d 825, 826 (6th Cir.), cert. denied, 498 U.S. 810 (1990); Plaine v. McCabe, 797 F.2d 713, 718 (9th Cir. 1986). We note that the cases adopting this abuse of discretion standard generally rely upon Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979) (adopting a test of discretion with respect to nonmutual offensive collateral estoppel only). See, e.g., Berger Transfer & Storage v. Central States Pension Fund, 85 F.3d 1374, 1376-1377 (8th Cir. 1996); Setter v. A.H. Robins Co., 748 F.2d 1328, 1330-1331 (8th Cir. 1984); State v. Daniels, 789 S.W.2d 243, 245 (Mo. Ct. App. 1990). Because mutuality is not lacking in this case, the equitable considerations requiring deference to the district court's evaluation of the overall fairness to the litigants in a nonmutual case are not present. Cf. Balbirer v. Austin, 790 F.2d 1524, 1526 (11th Cir. 1986) ("We note at the outset that application of collateral estoppel in a particular case is a matter of trial court discretion, . . . but that this court exercises plenary review over the rules governing collateral estoppel.").

## A. Issue Preclusion

We look to state law in determining whether to apply issue preclusion. See Royal Ins. Co. of Am. v. Kirksville Coll. of Osteopathic Med., Inc., 304 F.3d 804, 807 (8th Cir. 2002). "This rule applies [even] when the original judgment is that of another federal court sitting in diversity." Follette v. Wal-Mart Stores, Inc., 41 F.3d 1234, 1237 (8th Cir. 1994) (citations omitted), cert. denied, 516 U.S. 814 (1995).

The underlying goal of issue preclusion, also known as collateral estoppel, is to promote judicial economy and finality in litigation. Thus, "when an issue of

ultimate fact has been determined by a valid judgment, it may not again be litigated between the same parties." King Gen. Contractors v. Reorganized Church of Jesus Christ of Latter Day Saints, 821 S.W.2d 495, 500 (Mo. 1991) (en banc); see also Restatement (Second) of Judgments § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Under Missouri law, we consider three factors in determining whether to apply the doctrine:

> (1) whether the issue decided in the prior adjudication was identical to the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; and (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.

King Gen. Contractors, 821 S.W.2d at 500. Furthermore, only those issues actually and necessarily decided in the first suit may have preclusive effect in a subsequent action. See Brown v. Felsen, 442 U.S. 127, 139 n.10 (1979) ("Whereas res judicata forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit."); Abeles v. Wurdack, 285 S.W.2d 544, 546 (Mo. 1955) ("A judgment between the same parties on a different cause of action is binding as to the facts actually decided, and necessarily determined in rendering the judgment. . . .").

At times, courts also apply an additional factor when analyzing collateral estoppel. See, e.g., Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp., 968 F.2d 707, 711 (8th Cir. 1992) (stating that the fourth factor requires a court to determine whether the party against whom preclusion is asserted had a "full and fair opportunity" to litigate the issue); Shahan v. Shahan, 988 S.W.2d 529, 532-33 (Mo. 1999) (en banc) (same). However, the "full and fair opportunity to litigate" factor was developed to analyze cases where the parties in the first action are not the same

8

as those in the second.  See James v. Paul, 49 S.W.3d 678, 684 (Mo. 2001) (en banc) (describing the "full and fair opportunity to litigate" factor as a "shorthand description of the analysis required to determine if non-mutual collateral estoppel . . . permits use of a prior judgment to preclude relitigation of an issue even though the party asserting collateral estoppel was not a party to the prior case") (emphasis added).  Accord Haberer v. Woodbury County, 188 F.3d 957, 963 (8th Cir. 1999) (applying Iowa law and refusing to consider the "full and fair opportunity to litigate" factor where the parties in both actions were the same); Restatement (Second) of Judgments § 28(5) and cmt. g (1982) (limiting the fairness inquiry in cases with the same parties to situations involving misconduct by adversaries or other special circumstances).  FAG and Liberty were both parties in LM I, therefore, absent a strong showing to the contrary, we assume that both had a full and fair opportunity to litigate the relevant issues.  Accord Restatement (Second) of Judgments § 28 cmt. j (1982) (noting that preclusion can be avoided by a "compelling showing of unfairness").

Analyzing these requirements, the district court observed that the only factor in dispute is the identity of the issues in both cases.  In rejecting FAG's attempt to define the issue in LM I narrowly – whether the airborne releases of TCE prior to 1982 were "sudden and accidental" – the court noted that FAG's tactic of limiting the evidence presented in LM I did not change the issue that was decided.  Instead, the district court defined the issue in LM I broadly and concluded that it is the identical issue being litigated in LM II – the character of, and derivatively the insurance coverage for, FAG's TCE releases.  The district court concluded that the decision in LM I precludes FAG in LM II from presenting any sources of TCE contamination other than pre-1982 vapor emissions.

On appeal, FAG argues that issue preclusion should not apply because (1) the issues in LM I and LM II are not identical; (2) there has been a material change in circumstances since LM I was decided; and (3) application of the doctrine would be inequitable.  We address each argument in turn.

9

First, FAG asserts that the issues in LM I and LM II are not identical and, therefore, that issue preclusion cannot apply. Defining the issue in the prior litigation is crucial in determining whether issue preclusion is available. Generally speaking, the broader a court defines the issue previously litigated, the more likely it is to have preclusive effect in a subsequent litigation. On the other hand, by defining the issue narrowly and only in terms of the evidence or arguments actually considered by the court, litigants may be successful in arguing that the second proceeding involves a new or distinct issue not decided in the first. Using this tactic, FAG asserts that the only issue decided in LM I was whether its pre-1982 airborne emissions of TCE were "sudden and accidental" releases, and that the issue presented in LM II is whether the pipeline cut was a "sudden and accidental" release.

The court below rejected this narrow definition of the issue in LM I, as do we. In granting summary judgment to Liberty, the LM I court necessarily decided three relevant issues. Ultimately, the court determined that Liberty had no obligation to indemnify or to continue to defend FAG in the Moretz action. In reaching this conclusion, the LM I court also determined, based on the undisputed evidence, that the only sources of contamination were pre-1982 airborne emissions of TCE released through FAG's reclamation system.[5] Next, the LM I court concluded that these pre-1982 airborne emissions were not "sudden and accidental" releases and, therefore, were excluded by the policy.

---

[5]Liberty Mut. Ins. Co. v. FAG Bearings Corp., No. 94-0241, slip op. at 9 (W.D. Mo. May 14, 1996) ("Defendant's AMEG vapor recovery system frequently and repeatedly malfunctioned, releasing large amounts of TCE into the air over a long period of time. The only evidence presented indicates that this continued to occur as long as the 'closed loop' system was in operation, that is, from at least 1973 to 1981 or 1982. FAG's employees and its expert opine that these vapors condensed and returned to the soil on FAG's property, and there is no evidence that FAG released TCE in any other manner.").

10

In LM II, the ultimate issue is whether Liberty has an obligation to indemnify and defend FAG in a number of other underlying suits arising out of the same contamination at issue in Moretz. The two subissues in this case are the same as those in LM I – the identification of the sources of release and whether those releases were "sudden and accidental." As the district court noted, the fact that FAG now possesses previously unpresented evidence as to the sources of release does not serve to change the issues decided in LM I.

FAG argues that this broad definition of the issue in LM I is directly contrary to the limitations expressed by the LM I court in granting summary judgment. In a footnote in its May 14, 1996, order, and again in the order denying FAG's motion to alter and amend judgment, the LM I court stated:

> We make no finding with respect to Liberty's duty to defend FAG in actions which involve third party defendants, or in actions based upon facts other than those now before the Court. In addition, with respect to any pending case in which settlement has not been reached, Liberty is cautioned that it continues to be obligated to defend FAG against complainants filing substantially "false or fraudulent" claims.

Liberty Mut. Ins. Co. v. FAG Bearings Corp., No. 94-0241, slip op. at 14 n.11 (W.D. Mo. May 14, 1996). FAG asserts that this statement prevents the order from having any preclusive effect in this litigation. As explained below, we agree with the district court that "FAG's arguments fail to properly acknowledge the distinctions between claim preclusion and issue preclusion." Liberty Mut. Ins. Co. v. FAG Bearings Corp., No. 99-5017, slip op. at 8 (W.D. Mo. May 21, 2001).

The district court noted that the purpose for the LM I court's statements was to avoid the effect of claim preclusion in future cases. Id. at 10 ("Despite FAG's post-judgment attempts to expand the scope of his ruling, Judge Stevens' decision was necessarily limited to the Moretz Action because he did not know what allegations

11

were (or would be) raised in other lawsuits. Not knowing whether a plaintiff might sue FAG for injuries resulting from the release of a chemical other than TCE (as intimated by both parties' post-judgment filings), . . . Judge Stevens simply acknowledged that his judgment could have no claim-preclusive effect over those cases when he refrained from addressing Liberty Mutual's obligations in suits other than the Moretz Action."). Although his decision did not necessarily decide the rights and obligations of the parties as to other pending or future suits, any issues necessarily determined by Judge Stevens in the resolution of LM I, to the extent that they are now common to this pending action, cannot be relitigated.

The issue of the source of TCE groundwater contamination at FAG's factory was actually litigated and necessarily decided in LM I, and, therefore, may not be relitigated in LM II. In order to determine whether FAG's TCE releases were "sudden and accidental," the LM I court was required to ascertain the source of those releases. The LM I court did not simply look to the Moretz record and assume that vapor emissions were the only source of contamination. FAG consistently argued that the faulty TCE reclamation system was not the sole source of the contamination giving rise to the underlying actions, and recognized that a finding to the contrary could serve to prejudice FAG in future actions. The LM I court and this court both rejected its repeated attempts to argue this position because FAG's allegations were not supported by sufficient evidence to raise an issue of material fact as to the existence of any other source of contamination or any other methods of release.

Next, FAG argues that even if the issues are the same, there is an exception to the application of issue preclusion where circumstances have changed since the initial litigation. According to FAG, the "changed circumstances" exception allows litigants to avoid issue preclusion where the underlying facts have changed or where new evidence requiring a different result is discovered. FAG asserts that the recent discovery of the pipe cut incident qualifies either as a change in events or as newly discovered evidence and, therefore, prohibits the application of issue preclusion.

12

FAG argues that the discovery of the pipe cut incident is the same as a change in the underlying facts. We disagree. The cases cited by FAG all involve situations where the courts refused to apply collateral estoppel because of events that occurred or relationships that actually changed between the first and second actions. In this case, all of the events giving rise to FAG's liability in the underlying suits occurred before the filing of LM I. Where the first and second actions are both based on an evaluation of the same historical facts, a litigant seeking to introduce newly discovered evidence otherwise in existence at the time of the first suit may not argue that the facts have changed in the timeperiod between the two actions in order to avoid the preclusive effect of the first decision. The line of cases cited by FAG is clearly distinguishable. See, e.g., Montana v. United States, 440 U.S. 147, 159 (1979) (noting that "changes in facts essential to a judgment will render collateral estoppel inapplicable" and citing as examples cases dealing with alteration of alimony in light of remarriage by former wife, reevaluation of amount of condemnation award in subsequent condemnation actions where effect of short-term government option is dependent on changing economic conditions, and reevaluation of taxpayer status in subsequent tax years); Farrow v. Brown, 873 S.W.2d 918, 920 (Mo. Ct. App. 1994) (refusing to apply preclusion in action for private road where issue of necessity had been decided 24 years earlier and physical changes to the land had occurred in the meantime).

FAG also argues that because Restatement (Second) of Judgments § 29 cmt. j (1982) suggests that there should be no preclusion where "new evidence has become available that could likely lead to a different result," it should not be precluded from introducing evidence of the pipe cut in LM II. FAG relies upon its earlier failures to present evidence of the pipe cut to argue that coverage for damages arising out of that incident was not "actually litigated." Liberty argues that because FAG had an opportunity to present evidence of the other types of release in LM I and failed to do so, it is precluded from attempting to present that additional evidence now. The court below adopted this same reasoning, concluding that "FAG's tact in limiting the

13

evidence presented to Judge Stevens did not change the issue that was before him . . . . It was incumbent upon FAG to present favorable evidence demonstrating the character of those releases brought them with[in] the policy's coverage." Liberty Mut. Ins. Co. v. FAG Bearings Corp., No. 99-5017, slip op. at 11, 12 (W.D. Mo. May 21, 2001) ("[I]ssues that are litigated are not necessarily co-extensive with the evidence presented."). We agree that at the time FAG argued in LM I that there were multiple potential sources of TCE contamination, it had the opportunity, but failed to produce any evidence to substantiate these allegations. Accord In re Kelly, 238 B.R. 156, 161 (Bankr. E.D. Mo. 1999) ("The issue is not whether the party to the prior proceeding offered all of the evidence it proposed to offer, but whether the party had an opportunity to do so.") (citing Buckley v. Buckley, 889 S.W.2d 175, 178 (Mo. Ct. App. 1994)).

Liberty also notes that § 29 of the Restatement is applicable only to cases involving different parties, and that the relevant provisions of the Restatement define "issue litigated" broadly enough to preclude bringing forth in a later proceeding new evidence or new legal theories that might have been raised in the prior adjudication of the issue. We agree. See Restatement (Second) of Judgments § 27, cmts. c, e (1982). Comment c states that "if the party against whom preclusion is sought did in fact litigate an issue of ultimate fact and suffered an adverse determination, new evidentiary facts may not be brought forward to obtain a different determination of that ultimate fact." Id. cmt. c. The following illustration extrapolates on this view:

> A brings an action against B to recover for personal injuries in an automobile accident. A seeks to establish that B was negligent in driving at an excessive rate of speed. After trial, verdict and judgment are given for B. In a subsequent action by B against A for injuries in the same accident, A is precluded from setting up B's negligence as a defense, whether or not the alleged negligence is based on an assertion of excessive speed. It is reasonable to require A to bring forward all evidence in support of the alleged negligence in the initial proceeding.

14

Id. illus. 4. In order to decide the ultimate issue in LM I, the district court was required to determine first, how FAG released TCE, and second, whether that method of release was "sudden and accidental." The LM I court concluded, and we agreed on appeal, that the only method of release supported by the undisputed evidence was the release via vapor emissions. Under the analysis in the example above, any evidence or theories asserting a different factual basis for how the TCE was released should have been presented in LM I.

There is a significant line of cases suggesting that litigation of an issue necessarily encompasses all arguments and evidence that could be presented to resolve the issue, and that the mere discovery of new evidence does not create a new issue. These cases indicate that litigants may not have a second opportunity to prove a fact or make an argument relating to an issue previously decided. See, e.g., Yamaha Corp. of Am. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992) ("[O]nce an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case."), cert. denied, 506 U.S. 1078 (1993); Sec. Indus. Ass'n v. Bd. of Governors, 900 F.2d 360, 364 (D.C. Cir. 1990) (noting that the plaintiff may not raise a new argument in a second proceeding if it could have been made in the first); Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 2-3 (1st Cir. 1983) (commenting on a party's attempt to offer new theories, evidence, and arguments in a second litigation, the court noted that "[i]t is just this type of argument, however, that collateral estoppel bars [the plaintiff] from making. [The plaintiff] had a fair opportunity to make these arguments and to introduce this evidence the first time. The law requires the court to offer [the plaintiff] nothing more. . . . Once a plaintiff has had a chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence." (internal quotations omitted)); Jones v. United States, 466 F.2d 131, 136 (10th Cir. 1972) ("Evidence of this type is not the result of a different factual situation or changed circumstances. It is, instead, historical in nature and could have been admitted at the first trial if properly submitted. If the taxpayers' case was not

15

effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed."), cert. denied, 409 U.S. 1125 (1973).

In situations where the same parties are involved, the rationale behind these cases makes no exception for prior decisions that were wrongly decided because of insufficient or unavailable evidence. While we recognize that Missouri courts have not clearly indicated how to resolve the fairness and accuracy versus efficiency and finality conundrum, most courts require more to avoid issue preclusion than simply an assertion that the previous decision was wrong. See, e.g., Brown, 442 U.S. at 132 (recognizing that by promoting repose and stability in judgments, collateral estoppel often "blockades unexplored paths that may lead to truth"); SEC v. Monarch Funding Corp., 192 F.3d 295, 303-04 (2d Cir. 1999) (noting that the virtues of issue preclusion do not come without a price: "Just as occasionally 'the race is not to the swift, nor the battle to the strong . . . but time and chance happeneth to them all,' Ecclesiastes 9:11 (King James ed.), so too the results of an earlier resolution of an issue may simply be wrong."); Johnson v. Watkins, 101 F.3d 792, 795 (2d Cir. 1996) (recognizing that the doctrine of collateral estoppel "represents an informed choice that the occasional permanent encapsulation of a wrong result is a price worth paying to promote the worthy goals of ending disputes and avoiding repetitive litigation"); James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 463 (5th Cir.) ("To be sure, we recognize that whenever a court considers applying the doctrine of collateral estoppel, there is always a lingering question whether the party might have succeeded in proving his point if he had only been given a second chance at producing evidence. Without more, however, this question is not sufficient to outweigh the extremely important policy underlying the doctrine of collateral estoppel – that litigation of issues at some point must come to an end."), cert. denied, 404 U.S. 940 (1971); Bailey v. DiMario, 925 F. Supp. 801, 810 (D.D.C. 1995) (noting that the "application of the doctrine of collateral estoppel represents a decision that the needs of judicial finality and

efficiency outweigh the possible gains of fairness or accuracy from continued litigation [of an issue] that previously has been considered by a competent tribunal") (internal quotations and citations omitted); Restatement (Second) of Judgments § 28 cmt. j (1982) ("Such a refusal to give the first judgment preclusive effect should not . . . be based simply on a conclusion that the first determination was patently erroneous."). But see Rogers v. Ford Motor Co., 925 F. Supp. 1413, 1419 (N.D. Ind. 1996) (stating that "[c]onfidence in the correctness of [an] earlier determination is fundamental to the principles of collateral estoppel").

FAG responds to this argument by asserting that it did not have a full and fair opportunity to litigate the issue because the evidence of the pipe cut and the reports analyzing its effects were not available before the decision in LM I. Accord Miller v. Miller, 956 P.2d 887, 898 (Okla. 1998) (noting that "the availability of new evidence can be considered in determining whether a litigant has had a full and fair opportunity to litigate an issue in a prior action for purposes of applying preclusion doctrine"). Liberty asserts that FAG may not invoke a fairness analysis where the failure to present the "new" evidence in LM I was completely attributable to FAG's lack of diligence. Indeed, the cases cited by FAG adopting § 29 of the Restatement all involved situations where the relevant evidence had been absent from the prior litigation by no fault of the litigant against whom preclusion was sought. See, e.g., Jack Faucett Assocs. v. AT&T Co., 744 F.2d 118, 128-29 (D.C. Cir. 1984) (refusing to apply collateral estoppel where evidence tending to require a different result was excluded in the first action by erroneous evidentiary rulings by the court), cert. denied, 469 U.S. 1196 (1985); Rye v. United States Steel Mining Co., 856 F. Supp. 274, 278-79 (E.D. Va. 1994) (refusing to apply collateral estoppel where key witness disappeared before first trial and court made other erroneous evidentiary rulings); Mocci v. Carr Eng'g Assocs., 703 A.2d 686, 688-89 (N.J. Super. Ct. App. Div. 1997) (refusing to apply collateral estoppel where testimony by expert witness in original suit who had surveyed the wrong piece of land led to an erroneous decision); see also In re Ga. Granite Co., 86 B.R. 733, 739 (Bankr. N.D. Ga. 1988) ("Newly discovered

17

evidence may preclude application of the collateral estoppel doctrine if the party against whom collateral estoppel is asserted was deprived of crucial evidence in the prior litigation without fault of his own.") (citing Butler v. Stover Bros. Trucking Co., 546 F.2d 544 (7th Cir. 1977)).

FAG argues that due diligence is irrelevant to the introduction of new evidence. Recognizing that the issue is not whether the prior decision should be set aside, but whether it should preclude relitigation of the same or similar issues in a subsequent case, Restatement § 29 specifically states that a lack of due diligence should not prevent a party from presenting the new evidence. See Restatement (Second) of Judgments § 29 cmt. j (1982); see also Barker v. Brinegar, 788 A.2d 834, 840 (N.J. Super. Ct. App. Div. 2002) ("[T]he judge may consider diligence, or lack of diligence, . . . [but] a lack of diligence does not require invocation of collateral estoppel particularly where, as here, plaintiff attempted to obtain Dr. Matthew's evaluation prior to the arbitration proceeding."). But see Klein v. Comm'r, 880 F.2d 260, 263 (10th Cir. 1989) ("A party may not assert a change in controlling facts when the facts allegedly showing a change in circumstances could have been discovered in the exercise of due diligence."); Calcutt v. Comm'r, 91 T.C. 14, 25 (1988) (holding that "evidence which, by due diligence, could have been produced in the first proceeding is considered to have been available at the first proceeding" and, therefore, will not preclude the application of collateral estoppel). Having concluded that the fairness requirements embodied in Restatement § 29 apply only in cases involving nonmutual estoppel, we are not persuaded by FAG's reliance on § 29. In light of persuasive case law and other relevant Restatement sections indicating that discovery of new evidence cannot prevent the application of issue preclusion, we do not believe that the Missouri courts would conclude that the dilatory discovery of the pipe cut ordered by FAG and observed when it was done by one of FAG's employees is sufficient for FAG to avoid the preclusive effect of the district court's findings in LM I.

Even if we were to determine that Missouri courts would consider new evidence in determining the ultimate fairness of applying issue preclusion, we conclude that because Restatement § 29 and extensive fairness inquiries are relevant primarily in cases involving nonmutual issue preclusion, some degree of diligence must be shown to avoid the application of issue preclusion on a "new evidence" theory where the parties in both actions are the same and there is no allegation that another party's actions prevented the introduction of the evidence by the estopped party in the initial litigation.[6]  In all but a few of the cases that we have found allowing the introduction of new evidence, that evidence was absent from the original proceeding by no fault of the party subject to preclusion.  The unfairness in these cases occurred not because of the fact that material evidence was not presented, but because of the way in which it was kept out.

We do not believe that Missouri would extend this fairness consideration to every party who claims to have new evidence.  This would eviscerate the doctrine of issue preclusion.  Where the party sought to be precluded has completely failed to discover and present material evidence that was reasonably available, by no fault of any other party or insufficient court procedure, it is not unfair to bind them to the prior decision, despite the existence of evidence that may have changed the result.

We find no merit in FAG's other fairness-based arguments against issue preclusion.  Indeed, we believe it would be unfair to allow FAG to receive the benefit of defense and indemnification from Liberty on the basis of the newly-discovered

---

[6]Although no court has specifically considered whether FAG exercised due diligence in discovering the pipe cut incident, the LM I court did find that FAG failed to exercise due diligence in discovering other sources of release, and denied its 60(b) motion for relief from judgment on this basis.  Furthermore, in the related Gulf States litigation, the same district court noted that FAG had been consistently apathetic and evasive in researching the causes of the contamination and in conducting groundwater and soil testing.

pipe cut theory where FAG's adversaries in the underlying suits secured verdicts or settlement agreements without evidence of the pipe cut incident and on the basis of FAG's other methods of pollution alone. The court below correctly applied the doctrine of issue preclusion in this case. FAG is precluded from relitigating the cause of contamination or the sources of pollution in <u>LM II</u>. The judgment of the district court is affirmed.

## B. Application of the Pollution Exclusion Clause

Having determined that FAG is precluded from asserting that the cause of TCE contamination was the pipe cut incident, we refrain from deciding whether that incident, standing alone, would qualify as a "sudden and accidental" release. Although we may disagree with the district court's legal analysis of the issue, because we affirm on other grounds, a further discussion by this court is unnecessary to the resolution of this appeal.

## C. The Administrative Proceedings

FAG's insurance policy declares that Liberty has a duty to defend "any suit against the insured seeking damages." Liberty asserts that it does not, and never did, owe an obligation to FAG to defend against agency action in administrative proceedings because those proceedings are not "suits." FAG disputes this assertion, claiming that the relevant Eighth Circuit opinion, <u>Gen. Dynamics Corp.</u>, 968 F.2d at 713-14 (holding that agency demand letters are not "suits"), is no longer viable because it relies on a case that was subsequently abrogated. We disagree and adopt and affirm the well-reasoned opinion of the district court on this issue. <u>See</u> 8th Cir. R. 47B.

### III. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.